PETROPLUS, JUDGE:
The claimant, Tri-State Stone Corporation, entered into a contract with the State Road Commission of West Virginia, now the West *91 Virginia Department of Highways, respondent, for the construction of a section of highway in the City of Clarksburg, Harrison County, West Virginia, designated as Project U-282 (18) C-2 and commonly known as the Clarksburg Expressway. The contract was awarded to the claimant as the successful bidder on a unit price bid proposal, and is dated March 19, 1963. In accordance with the custom for highway construction projects in West Virginia, the bid proposal based on estimated quantities, the plans and profiles prepared by the respondent, and the Standard Specifications Roads and Bridges, adopted in 1960, as well as Special Provisions amending and supplementing the Standard Specifications, were made a part of the contract by reference, and are all considered contract documents. The bid was in the amount of $1,062,939.30 for .8 of a mile of road, including access roads, cloverleaf ramps, relocation of streets and utilities, construction of culverts and drains, and a major fill and cut on the west side of West Fork River which bisected the project. A new bridge had previously been constructed in the job area and spanned the river, which bridge was to be used by the contractor in hauling materials from one end of the project to the other. The new road to be constructed followed the bank of the riyer for some distance and required a fill and embankment for its support.
From its inception, the work on this project created many difficulties and problems for the contracting company. The work was started on March 25, 1963, and was to be completed within 180 working days, subject to the imposition of liquidated damages in the amount of $165.00 per day for delayed completion. Although the scheduled completion date was in November, 1963, the project was not completed until December 31, 1964, more than a year late. After allowances for change orders and excusable delays, the claimant was assessed in the amount of $2,970.00 as liquidated damages at the final accounting, which did not take place until May 15, 1969. Final payment was made to the contractor at that time, with a reservation of rights on behalf of the contractor to file a claim in this Court for the disputed items hereinafter mentioned.
A petition claiming damages in the amount of $224,010.66 was filed by the contractor on September 10, 1969, outlining in meticulous detail fourteen different items in dispute. The Answer filed by the respondent indicated a wide divergence of views, with little or no area of agreement on any of the items in controversy. The hearing began *92 on November 30, 1970, and continued until seven transcribed volumes of testimony were taken of witnesses produced by both parties. More than one hundred twenty exhibits were filed, including a motion picture film and numerous photographs of various activities on the project. In addition, pre-trial discovery depositions were filed and very lengthy briefs. These matters are mentioned to show the conscientious endeavors of the claimant and respondent to present their respective claims and defenses, and the thoroughness with which the case was prepared. As stated, there was little or no disposition on the part of either party to make concessions or admissions which would shorten the travails of this Court in resolving the controversy.
In considering and deciding each item, this Court has endeavored to interpret and apply the'Standard Specifications and the Special Provisions of the construction contract, in the light of applicable decisions of this Court in prior cases and decisions of the Supreme Court of Appeals of the State of West Virginia. The. findings of fact are embodied in this Court’s decision of each of the items which follow.
The petition charges the respondent with continually delaying and harassing the contractor by imposing additional requirements not included in the original plans and specifications, and under threat of shut-down from time to time, demanding extra work to be performed without Change Orders, Force Account, or Supplemental Agreements, as required by the specifications. The Court finds little or no basis for the contention that the respondent engaged in a plan of harassment to impede the progress of the work and embarrass the contractor because it or members of the family of Mr. C. E. Wetherall, owner and manager of the company, had filed claims for damages against the State Road Commission in other proceedings before this Court. However, it is the opinion of the Court, and it is so found in this opinion, that the claimant’s performance under the contract was unduly regulated, interfered with and supervised by a zealous application of the Specifications to almost every detail of the project. It appears that the claimant was given little or no discretion to exercise judgment on reaching the desired result. The superintendent employed by the claimant, Mr. Chester Miller, a Registered Engineer, was ordered removed from the project shortly after it began because of refusal to comply with the directions of the respondent’s engineer and conduct otherwise designated as insubordination, and the claimant did comply with this order by removing its engineer from the project and replac *93 ing him with Mr. C. E. Wetherall and another engineer. Because of Mr. Miller’s familiarity with the contract and terrain, the claimant endeavored to use him for consultation some distance away from the job site, but the respondent ordered him banished from the Clarks-burg area. The dismissal of the project engineer is not involved in the adjudication of the claims, but is mentioned merely as an illustration of the importunities of the respondent on this particular project.
The respondent ordered a complete shut-down of the project on July 3, 1963, because unclassified excavation wa:s laid by the contractor in a small area in layers that did not comply with the specifications, and it remained shut-down for thirteen working days, during which period construction equipment remained idle and no activity took place on other phases of the project not in dispute. On July 22, 1963, after the contractor yielded under protest to the demands of the respondent to lay the material in 8 inch layers rather than 24 inch layers, as the contractor contended, the work was resumed.
Mr. William C. Sandy, respondent’s District Engineer, who was also familiar with the project, was replaced by W. J. Galloway, District Engineer, who ordered a shut-down a few days after his appointment. While the work was in progress, a task force from Charleston found fault with the work and reported to the Charleston office that the job was out of control and that the contractor had taken over.
The claimant has cited many acts of alleged hostility toward its personnel, impeding the progress of the work and impairing its efficiency. The delays, many of them justified and unavoidable, naturally delayed the sequence of operations, which increased costs and otherwise compounded the problems of the contractor, which was working under a “tight” contract in a congested area of Clarksburg.
All of these allegations are vigorously denied by the respondent, which took the position that it had the right to control the construction and make the contractor comply with the plans and specifications of the contract by making inspections and investigations of its working methods, to the end of achieving a proper result in the public interest. It was admitted after the final performance of the contract that the public improvement is of good quality, has held up well and that the work done by the claimant was very satisfactory.
The issues are defined as follows:
*94 1. Did the contractor do the work and furnish the materials according to the terms and provisions of the contract?
2. Was the contractor required to do extra work not covered by the contract for which it has not been compensated?
3. Did the contractor suffer loss or damage through the misfeasance or nonfeasance of the respondent?
4. Did the contract contain ambiguous provisions or apply conflicting specifications, making it impossible for the work to pass inspection?
5. Did the contractor interpret the specifications to his advantage, and thereby save costs and increase his profits to the detriment of the respondent?
6. Did the contractor give the requisite notices under Section 1.5.11 of the Standard Specifications adopted in 1960 that it would demand extra compensation for work and material not clearly covered in the contract, or not ordered by the State’s engineers as “Extra Work”?
These issues will be discussed and decided in accordance with the evidence submitted on each of the fourteen items of the claim and the findings of fact with relation thereto, applying the rule that the claimant has the burden of proving the material allegations of its complaint.

ITEM I UNCLASSIFIED EXCAVATION

This item is for the payment of $5,087.72, representing 4,103 cubic yards of Unclassified Excavation at the bid price of $1.24 per CY. Payment under this item is for the movement of earth excavated from the bed of the river and the river bank and was measured by the State according to cross-sections of the river made by a survey of the State’s engineers in 1955. The contractor contends that with the lapse of time and the shifting of material in the river bed through floods and the action of the current, the ground line of the river bottom changed, and the cross-sections used to measure its excavation were inaccurate because of the old survey. The ground line and the elevations used for measurement purposes for paying the contractor are alleged to be inaccurate, and apparently both parties were aware of this at the time the work was performed. The contractor contends that it removed material from the river bed which was excluded from *95 payment because of the use of an inaccurate ground line platted as the river bottom. Respondent does not deny the obsolescence of its plans and profiles, but takes the position that the burden of proof is on the claimant, which was aware that the State’s method of measurement was inaccurate, to measure the extra material in a reliable manner by making an engineering survey of its own to prove that the State’s survey, plans and profiles were in error. This does not constitute, in our opinion, a proper defense, and conceding that the contractor has the burden of proof to show the measurement of excess material for which it claims compensation, it was the duty of the respondent to properly measure this material and compensate the contractor on the unit price base per CY. The State further defends this item on the ground that no notice was given under Section 1.5.11 of the Standard Specifications adopted in 1960 that extra compensation would be requested before the beginning of the work on that portion of the project. The State also attacks the method used by Mr. C. E. Wetherall, manager of the contracting firm, in measuring the extra material excavated as haphazard and inexact.
It is the finding of the Court on this item that the respondent had the duty to measure the excavated material, properly using correct cross-sections of the ground line, and failing to do so, any other method of measurement reasonably available to the contractor could be used, provided it is not conjectural or speculative. When the State fails to measure the material properly, we know of no other way that the claimant can be compensated except to measure the material itself and prove its claim. The exhibits offered by the claimant indicated graphically a ground line and quantity of excess material excavated above the true ground line and are acceptable to this Court, particularly when the State has not offered any documented evidence controverting the accuracy of these exhibits. It is also reasonable for this Court to assume that the action of the river over a period of eight years did change the ground line, and that the State’s method of measuring, based on obsolete plans and elevations, would not be a reliable and satisfactory way of computing the excavated yardage.
The requirement in the specifications to give notice that extra compensation would be claimed before beginning the work, as we interpret Section 1.5.11 of the Standard Specifications, is applicable to cases where the contractor deems extra compensation will be due him for work not covered by the contract. In this instance the work *96 was covered by the contract as a bid item, subject to over-runs and under-runs, with relation to the proposed estimated quantity to be excavated. This is not a claim for extra work outside of the scope of the contract, but is a claim within the contract, and for that reason we hold that notice to the respondent is not required.
For the reasons stated, the Court is of the opinion to recommend an award of $5,087.72 on Item I of the claim.

ITEM II EXTRA WORK IN PLACEMENT OF FILLS

This is by far the largest item of the claim, and is in the amount of $97,140.47 for extra work performed in breaking up and crushing rock material in order to compact it in 8 inch layers, as required by the respondent in its interpretation of the Specifications and Special Provisions of the contract. The rock was drilled and shot, and placed in the fill in layers not to exceed 24 inches, that being the contractor’s interpretation of the Specifications and Special Provisions. The State immediately objected, contending that the specifications required a compaction into 8 inch layers. The contention of the contractor being to the contrary led to the shut-down of the project.
The contractor’s duty in making the fill by layers in an embankment is controlled by the nature of the fill material under Standard Specification 2.2.3 (E) (2) which reads in part as follows:
“Material shall be placed in embankments in successive layers not exceeding eight (8) inches in thickness before compaction, when it has not been necessary to use explosives to break up the material preparatory to excavation, and not exceeding twenty-four (24) inches in thickness when it has been necessary to use explosives. Materials such as shale or other formations other than solid rock, shall be placed in layers as much less than twenty-four (24) inches as the size of the material will permit
(Emphasis supplied).
The Special Provisions deleted the second sentence of the preceding Specification and substituted therefor the following:
“Materials such as shale or other formations other than solid rock shall be placed in layers not exceeding eight (8) inches in thickness before compaction.”
*97 It is difficult for us to understand in what manner the Standard Specification was changed by the Special Provision when the first sentence of the Standard Specification relating to identifying the material by use of explosives remained. A distinction was created without a difference. It is not clear to the Court what this change in language was intended to accomplish. We definitely feel that the requirement of laying the material in lifts not exceeding 8 inches or in lifts not exceeding 24 inches is determined by whether explosives are necessary to break up the material.
The contractor and the State had divergent views as to whether the material used for filling purposes was shale or rock, the State insisting it was shale and the contractor insisting on classifying it as rock. When the contractor persisted in laying the material as if it were rock in layers not exceeding 24 inches contrary to the State’s directive, the entire project was shut down, although work could have proceeded elsewhere on the project, and remained idle until work was again resumed under protest at the direction of the State’s engineer nineteen days later (the project was idle from luly 3, 1963, to July 22, 1963).
The contractor proceeded as directed when the project resumed in laying the material in 8 inch layers with compaction, an operation which slowed down the progress of its work with a costly increase in labor, equipment rental, and retreatment of the material. By forcing the material into 8 inch layers and retreating the same for compaction, the average material worked per day was reduced from 3,276 CY to 625 CY, or, stated otherwise, from 100% to approximately 19%.
Our interpretation of the Specification as revised by the amending Special Provision turns on the use of explosives to break up the material preparatory to excavation. We are unable to find any evidence introduced by the State which controverts the claimant’s proof that explosives were used to break up the rock. The evidence introduced by both parties through geologists and soil experts was conflicting, some analyzing the material as shale, limestone or sand stone, and others analyzing it as rock. The description of material by labeling it appears to be a matter of semantics, and we are not satisfied by the expert opinions stating that it was one or the other. No doubt the samples taken for the various tests depended on who did the sampling, and it is quite evident that the analyses were of samples presented to the geologists, engineers and soil experts by the respective parties. Inasmuch as the evidence that explosives were necessary to break up *98 the material was not controverted by the State, it is our finding that the material was predominantly composed of solid rock and had to be crushed and broken up by additional labor and use of equipment to compact it for use in the embankment.
In our award on this Item we are of the opinion that the claimant is entitled to the loss sustained in laying the material as directed by the State, said loss being $80,882.29 after giving the State credit for payments made under the item of unclassified excavation in the bid proposal. The comparison of costs per CY before and after the imposition of the additional requirement by the respondent does not reflect the true amount of damages resulting from what we consider to be an unwarranted imposition of the specifications on the contractor before approving its work. It is our finding that the contractor performed within the terms and provisions of the contract and its specifications.
We therefore recommend that this item of the claim be allowed in the amount of $80,882.29.

ITEM 111 EXTRA WORK IN REMOVAL AND RECOMPACTION OF QUANTITY OF FILL

This item is for a small amount of material removed, reworked and recompacted on orders of the State Engineer because of its failure to meet a compaction test, and also involves a decision on whether the reworked material was shale or rock. The claim is in the amount of $397.18. Material laid by the contractor in a 24 inch layer was removed on orders of the State, and later laid in an 8 inch layer to meet a compaction test. The proof of this item is unsatisfactory, and the claim is disallowed.

ITEM IV EXTRA WORK OF REHANDLING UNSUITABLE MATERIAL

This item of the claim is in the amount of $10,542.00 and represents the additional cost involved in disposing of waste material when the State refused to approve the waste disposal pits selected by the contractor on or near the project, thus requiring it to first stockpile the unsuitable material and pick it up again and haul it a greater distance to another site selected by the contractor, which met the approval of the State. The disposal of unsuitable material according to the specifications requires the approval of the State’s Engineer, and waste sites selected by the contractor are subject to approval by the *99 State. The State had future plans for the use of the area originally selected by the contractor for disposal of its waste, and was clearly within its contractual rights in refusing to approve the sites so selected by the contractor. This is a risk that the contractor assumes in any road construction project, and the additional cost requested for removal of waste to another site must be borne by the contractor. The claim is disallowed in its entirety.

ITEM V EXTRA WORK IN AERATING AND BLENDING UNSUITABLE MATERIAL

This item of the claim is in the amount of $5,000.00 to cover the cost of extra work performed in aerating and blending unsuitable material and upgrading it so it could be used on the project, and not disposed of as waste.
An eye-view of this material was presented to the Court by motion pictures. It was convincing evidence that the material was sloppy, soggy mud with a very high content of water making it impossible to use in a fill without extensive reworking and drying out to upgrade the material into a more stable state. The material displayed in the movies rippled like warmed over jelly and should have been wasted. The respondent, however, insisted on the material being used, and it is our finding that the State has a moral obligation to reimburse the contractor for excess costs in manipulating and upgrading this material. The requirement that the contractor use this soupy substance does lend some credence to its claim of harassment. A claim of 50 cents per CY for treatment of this material appears reasonable, and the claim is allowed in the amount of $5,000.00.

ITEM VI EXTRA WORK IN REMOVING UNCLASSIFIED EXCAVATION AROUND A STANDING POLE

A Western Union pole carrying a railroad signal line which was located within the construction limits of the project is the subject of this item of the claim. Approximately 1,000 CY of material had to be rehandled by shovel when the contractor had to work around the pole, which apparently had not been ordered removed by the State, and then return with equipment to remove a jutting spur of earth with the pole on top. Apparently the respondent erroneously advised the railroad company that this particular pole need not be removed. The claim for extra work is in the amount of $1,240.00 and is disal *100 lowed on the ground that the contract specifications clearly state that no compensation would be allowed for delay in removal of utility appurtenances. The contractor clearly assumes this risk in his bid proposal and must absorb the costs when his work is impeded by a standing utility pole.

ITEM VII ROCK BORROW EXCAVATION

A claim of $6,829.40 is made for 2,731.76 CY of Rock Borrow excavation at the bid price of $2.50 per CY, which was measured for payment by the State in the cut by the method of cross-sectioning. The respondent refused to pay for this item because the rock material was not incorporated in the work. In other words, the contractor cut more rock than was required for use in the fill, and the excess rock was laid outside of the template line. The evidence is conflicting on which party was responsible for moving the stakes beyond the template line, and then having them moved back to where they should have been. Inasmuch as the State Engineer, who had full control and supervision over the contractor’s work, acquiesced in the cutting of this extra rock to be placed in the fill erroneously marked by the stakes, and being admitted by the respondent that the rock did go into the fill, we hold that this claim should be allowed, notwithstanding the specification numbered Section 1.5.7, on which the State relies, prohibiting an inspector from altering' or enlarging any requirements of the Plans, Special Provisions or Specifications. This regulation of prohibition conflicts with Section 1.5.1 which requires the contractor to perform his work and furnish materials as determined by the State’s Engineer, who is authorized to supervise the work and decide all questions on the fulfillment of the contract requirements. The respondent did permit the extra rock to be cut and placed unnecessarily in the fill, and the State received the benefit of this work which stabilized the edge of the roadbed closely paralleling the river bank without objection. We deem it immaterial to determine in the decision of this item who was responsible for removing the stakes or who “eye-balled” the stakes into a different alignment. The claim is allowed in the amount of $6,829.40.

ITEM VIII EXTRA WORK IN PULLING IN TOE OF ROCK BORROW FROM RIVER BED

This item of.$2,467.61 represents the cost of equipment and labor in removing rock borrow from the river bed when the Road Com *101 mission personnel ordered the stakes reset and removal of rock borrow beyond template line. It should be allowed for the reasons set forth under Item VII. Claim is allowed in the amount of $2,467.61.

ITEM IX EXTRA WORK IN REHANDLING ROCK BORROW BECAUSE OF WEIGHT LIMITS IMPOSED BY THE STATE ON THE USE OF THE NEW BRIDGE BY CLAIMANTS TRUCKS

This item in the amount of $18,455.22 represents damages and extra costs incurred by the contractor when it was prohibited from using the new bridge over the West Fork River with what were deemed to be by the State overloaded trucks. The State refused to permit the contractor to use the bridge unless it secured lighter tandem axle vehicles for hauling material over the bridge. This necessitated the stockpiling of rock material brought to the bridge in the heavy trucks and reloading the material in lighter vehicles, which required re-handling of the material. The Special Provisions of the contract required the contractor to observe the weight limits for highways as provided by the Code of West Virginia. The State weighed the vehicles on three different occasions and found them overloaded. The clai-maint failed to prove to the satisfaction of this Court that its trucks were not in violation of the weight limits prescribed by law, but relied on the permissible use of the bridge with the heavier trucks before the load limits were strictly enforced. Apparently the contractor felt that having been permitted to use the heavier trucks, it had a continuing right to use the same throughout the duration of the project. We do not believe that the enforcement of the load limits was a harassment, as contended by the claimant. We hold that the respondent’s belated enforcement of the load limits to be justified and within the contemplation of the contract, and that the former permissible use of the bridge with excessive limits does not constitute a waiver of this provision of the contract. The claim of $18,455.22 is disallowed in its entirety.

ITEM X CRACK IN WALL

A claim of $542.97 is made for the removal of a certain portion of a concrete retaining wall, which the State contended was cracked by the operations of the contractor. The contractor was required to rebuild this portion of the wall, but insists that it was a pre-existing crack in the wall for which it was not responsible. It is our finding from the evidence and the photographs submitted that the contractor *102 was not responsible for the crack, and that his operations did not cause the same. The claimant should have been compensated for rebuilding that portion of the wall with new concrete on the basis of Force Account. The claim is allowed in the amount of $542.97.
ITEM XI EXTRA WORK IN RELAYING 60 INCH DRAINAGE PIPE DUE TO ALLEGED ERROR OF ROAD COMMISSION
This item of $2,109.10 for extra work caused by the interference of a water line of the Clarksburg Water Board located in the construction area with the laying of a 60 inch drainage pipe by the contractor is disallowed for the same reasons set forth in the ruling under Item VI. Interference by utility lines is an assumed risk of the contractor under the specifications of his contract, and he must bear the expense of working around the water line. The claim is disallowed.

ITEM XII COST OF EQUIPMENT RENTAL DURING UNWARRANTED SHUT-DOWN OF PROJECT

Under this item the contractor claims the sum of $36,525.82 as equipment rental during the thirteen working day shut-down of the project, extending from July 3, 1963, through July 19, 1963, as heretofore noted in the findings of fact by this Court. The amount claimed is taken from a book published by the Associated Equipment Distributors, 1963-64 Edition, setting forth average rental rates for construction equipment. The book is generally accepted in the heavy construction industry as a standard compilation of rental values of all types of road construction equipment.
We are of the opinion and find that the shut-down order issued by W. J. Galloway, District Engineer, by letter dated July 2, 1963, which gives no specific reason for the shut-down except a difference of opinion between C. E. Wetherall, Vice President of Tri-State Stone Corporation, and the Road Commission with respect to the interpretation of the Plans and Specifications, to be an arbitrary and unwarranted act on the part of the respondent. Although the specifications permit the State to shut down a project, it is the opinion of the Court that the suspension of a million dollar project in a congested area of Clarksburg, where the contractor is working under a tight contract and on difficult terrain, is a serious matter, and although the Standard Specifications authorize the Engineer to suspend the work (1.8.4) wholly or in part for such periods as he may deem necessary, due to *103 conditions considered unfavorable for suitable prosecution of the work, or due to the failure of the contractor to carry out orders given or perform the provisions of the contract, we hold that under the circumstances of this case the conduct of the Engineer was hasty and ill-considered. Little or no effort was made to resolve the differences with Mr. Wetherall on the nature of the material ordered to be laid in 8 inch layers, which is the basis of Item II of this action. As we have pointed out, the regulations were ambiguous with respect to this point, and there was an honest difference of opinion on whether the shale or rock classification applied to the material being used. Besides, only a small amount of the questioned material had been applied to the fill when the shut-down order came through. The Court is reluctant to question the judgment of an engineer who is skilled in the technical knowledge of his profession, and do not find fault with the opinion he rendered in good faith. We do have grave doubts, however, whether this violation of the terms of the contract justified the drastic procedure taken to force the contractor to rectify his faulty performance, as contended by the respondent. This specification should be applied with circumspection and prudence, taking into consideration the potential damage which would result to the contractor if the engineer should be wrong in his interpretation of the specifications. In this case the engineer apparently acted on data submitted by his subordinates to the Charleston office without making an on-site inspection of the project. In a project of this magnitude, it would appear to the Court that the chief engineer should make some effort to confer with the contractor, evaluate the variances from the contract, and attempt to resolve the differences before issuing a general shutdown order, and then invite the contractor to attend a meeting in Charleston to discuss the problem.
We have ruled under Item II of the claim that the respondent was wrong in the interpretation of the specifications, and under this Item we rule that the general shut-down of the project was arbitrary and capricious. The letter of July 2, 1963, which is the only documentation of the shut-down order is set forth verbatim because of its importance in the decision of this case.

*104
CLAIMANTS EXHIBIT NO. 4

“My 2, 1963 Centennial Year”
Mr. C. E. Wetherall, Vice President Tri-State Stone Corporation Kenova, West Virginia
Dear Sir:
Re: Project U-282-(18) C-2-Harrison County
There presently exists too great a difference of opinion between you and the Road Commission with respect to the interpretation of the intent of the plans and specifications and the approved procedures for executing the work necessary to get the results required by these plans and specifications. As a result of this difference of opinion we do not feel that the work is proceeding satisfactorily. It is necessary at this time to ask you to suspend operations on this project.
You are further advised that a meeting will be arranged between your Company and the Construction Division at which time an attempt will be made to resolve our common problem.
Very truly yours,
/s/ W. J. Galloway W. J. Galloway District Engineer”
This brings us to the problem of what amount of rental would be reasonable compensation to the contractor for the unwarranted suspension of the project. We are inclined to accept the standard rental compilation of the Associated Equipment Distributors book.
Although we find that the State was at fault in this matter, we further find that the contractor was not entirely without fault on its part. It appears that the contractor could not arrange a meeting promptly because of “other commitments”. The importance of this matter to the claimant justified sending a representative promptly to Charleston to attend the meeting in two or three days. The claimant’s attorney did not call the respondent until July 12, some nine days after the *105 shut-down letter was received. This delay in arranging a conference cannot be attributed to the respondent, and we are not inclined to excuse the claimant for its procrastination while incurring heavy damages daily during the shut-down. It appeared that after the meeting was held in Charleston, an order was issued immediately for resuming the work.
The rental will be reduced to less than one-third of the amount claimed, it being the opinion of the Court that dilligent action on the contractor’s part could have reactivated the project much sooner. Mr. Galloway, Chief Engineer, ordered the working operations resumed by letter dated July 12, 1963, setting forth the conditions imposed on the contractor to lay the “shale” material in 8 inch layers. Work was not actually resumed until July 22, 1963. Rental damage will be awarded to the claimant in the amount of $9,131.25.

ITEM XIII GAS LINE

A further claim of $36,813.27 is made for extra work entailed when the contractor was faced with problems presented by a high pressure gas main owned by the Hope Natural Gas Company situated within the construction limits. We find no merit in this claim, as utility removal is not the responsibility of the respondent. The contractor under the specifications, as previously held in this opinion, assumes all risk of inconvenience or delay caused by failure to remove obstructive utility lines. This item of the claim is denied in its entirety.

ITEM XIV LIQUIDATED DAMAGES

We cannot conscientiously permit the respondent under the circumstances of this case to impose and make effective the liquidated damages provision of the construction contract. The delays in this project, some of them excusable and unavoidable, and some of them unwarranted, were not exclusively attributed to the fault of the contractor as shown by this voluminous record of job-site problems and difficulties of securing prompt solutions to these problems. It appears that subordinate personnel of respondent had no authority to make final decisions and resorted to communication with higher echelons of authority, which was a time consuming procedure. The contractor was faced with many frustrations because of delayed decisions by the respondent and it affected the progress of its work. The contractor was also faced with many changes of State personnel during the work, *106 and change of engineers, in addition to the problems created by the removal of his superintendent, Chester Miller, whose physical presence was ordered out of the construction area in addition to his removal from a position of authority on the project. Under these conditions liquidated damages would be an unfair and undeserved punishment of the contractor. Liquidated damages are disallowed in their entirety.
In conclusion, we recapitulate the claims as follows:
Amount Claimed Amount Allowed Amount Disallowed
ITEM I $ 5,087.72 $ 5,087.72
ITEM II 97,140.47 80,882.29 $ 16,258.18
ITEM III 397.18 397.18
ITEM IV 10,542.00 10,542.00
ITEM V 5,000.00 5,000.00
ITEM VI 1,240.00 1,240.00
ITEM VII 6,829.40 6,829.40
ITEM VIII 2,466.61 2,466.61
ITEM IX 18,455.22 18,455.22
ITEM X 542.97 542.97
ITEM XI 2,109.10 2,109.10
ITEM XII 36,525.82 9,131.25 27,394.57
ITEM XIII 36,813.27 36,813.27
ITEM XIV 2,970.00 2,970.00
$226,119.76 $112,910.24 $113,209.52
This Court should comment on Standard Specifications 1.4.1, 1.5.1, and 1.5.7, on which the respondent relies so emphatically for its defenses to the various items of claim. These Specifications state in effect that the State Road Commissioner’s decision on the intent and meaning of the specifications shall be final and conclusive, the State’s Engineer is authorized to decide all questions which may arise as to the interpretation of the Plans and Specifications, and inspectors may reject material and suspend the work until questions at issue can be referred to and decided by the Engineer. These broad delegations of power must be exercised in a reasonable manner under the particular circumstances of each case and not in an arbitrary or capricious manner. In essence the State is dealing with independent road contractors who have contracted to produce a result, and every contractor is *107 permitted by law to supervise his project and his servants and employees as to the manner in which they are to perform the details of their work. The men on the job are the agents of the contractor, who is responsible for a good and workmanlike job, that is to be inspected and supervised generally by the engineers of the State who occupy a position of authority to oversee the manner of performance and rate of progress to the end that all contract requirements are fulfilled. Such authority should be exercised in a reasonable maimer and with prudence without unnecessarily impeding the progress of the work or engaging in conduct without thought of the consequences to the contractor. Controversies with contractors too often necessitate resorting to the Court of Claims for relief and payment of damages. Differences of opinion and misunderstanding of job specifications should not be permitted to snow-ball into substantial claims in the Court, unless they cannot be resolved in the field with due regard for the mutual rights and responsibilities of the parties and better communication between the parties.
Claim allowed in the amount of $112,910.24.